UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILLIAM COMSTOCK,<br><br>                     Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of Social Security,<br><br>                     Defendant. | CASE NO. C17-5288-MAT<br><br>ORDER RE: SOCIAL SECURITY<br>DISABILITY APPEAL |

Plaintiff William Comstock proceeds through counsel in his appeal of a final decision of the Commissioner of the Social Security Administration (Commissioner). The Commissioner denied plaintiff's application for Disability Insurance Benefits (DIB) after a hearing before an Administrative Law Judge (ALJ). Having considered the ALJ's decision, the administrative record (AR), and all memoranda of record, this matter is AFFIRMED.

**<u>FACTS AND PROCEDURAL HISTORY</u>**

Plaintiff was born on XXXX, 1963.[1] He completed the eighth grade and previously worked as a glazier, caulker, and auto windshield installer. (AR 50, 83, 252.)

---

[1] Plaintiff's date of birth is redacted back to the year in accordance with Federal Rule of Civil Procedure 5.2(a) and the General Order of the Court regarding Public Access to Electronic Case Files.

ORDER
PAGE - 1

Plaintiff protectively filed a DIB application in November 2012, alleging disability beginning July 1, 2011. (AR 191.) Plaintiff remained insured for DIB through December 31, 2013 and was required to establish disability on or prior to that "date last insured" (DLI). *See* 20 C.F.R. §§ 404.131, 404.321. His application was denied initially and on reconsideration.

On June 4, 2014, ALJ David Johnson held a hearing, taking testimony from plaintiff, his wife, and a vocational expert (VE). (AR 40-89.) On August 15, 2014, the ALJ issued a decision finding plaintiff not disabled. (AR 20-35.)

Plaintiff timely appealed. The Appeals Council denied plaintiff's request for review on February 22, 2016 (AR 9-14), making the ALJ's decision the final decision of the Commissioner. Plaintiff appealed this final decision of the Commissioner to this Court.

## **JURISDICTION**

The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## **DISCUSSION**

The Commissioner follows a five-step sequential evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920 (2000). At step one, it must be determined whether the claimant is gainfully employed. The ALJ found plaintiff had not engaged in substantial gainful activity since the alleged onset date. At step two, it must be determined whether a claimant suffers from a severe impairment. The ALJ found plaintiff's left shoulder abnormality, low back abnormality, recent L5-mid metatarsal fracture, and sleep apnea severe. The ALJ found no severe mental impairment. Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ concluded plaintiff's impairments did not meet or equal the criteria of a listed impairment.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess

residual functional capacity (RFC) and determine at step four whether the claimant has demonstrated an inability to perform past relevant work. The ALJ found plaintiff able to perform light work not requiring more than occasional bending, stooping, crouching, or left upper extremity pushing or pulling; no more than frequent reaching, handling, or fingering; and not requiring the need to grab onto grab bars, railings, or ladders, work overhead with the left upper extremity, or walk on irregular surfaces. The ALJ found no past relevant work.

If a claimant demonstrates an inability to perform past relevant work, or has no past relevant work, the burden shifts to the Commissioner to demonstrate at step five that the claimant retains the capacity to make an adjustment to work that exists in significant levels in the national economy. With the assistance of the VE, the ALJ found plaintiff capable of performing other jobs, such as work as a small parts assembler, solder machine feeder, and tagger. The ALJ also found that, even if more limited, plaintiff could still perform the occupations identified, as they are unskilled, consisting of simple tasks that require little or no judgment. He noted the VE's testimony the occupations could still be performed with additional limitations related to teamwork, interaction, and routine nature of tasks.

This Court's review of the ALJ's decision is limited to whether the decision is in accordance with the law and the findings supported by substantial evidence in the record as a whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). *Accord Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) ("We will set aside a denial of benefits only if the denial is unsupported by substantial evidence in the administrative record or is based on legal error.") Substantial evidence means more than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If there is more than one rational interpretation, one of

which supports the ALJ's decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

Plaintiff asserts error in the consideration of medical opinions and evidence relating to his shoulder impairment, ability to stand and walk, and mental impairments, and in the rejection of his wife's testimony. He requests remand for further proceedings. The Commissioner argues the ALJ's decision has the support of substantial evidence and should be affirmed.

## Medical Opinions and Evidence

Plaintiff contends the ALJ erred in considering medical opinions from examining physicians, and in construing medical evidence. Because the record contained contradictory physician opinions, the ALJ could only reject the opinion of the examining physicians with "'specific and legitimate reasons' supported by substantial evidence in the record for so doing." *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1996) (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

The ALJ is responsible for resolving conflicts in the medical record. *Carmickle v. Comm'r of SSA*, 533 F.3d 1155, 1164 (9th Cir. 2008). When evidence reasonably supports either confirming or reversing the ALJ's decision, the court may not substitute its judgment for that of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 599 (9th Cir. 1999).

A.  Shoulder Impairment

In February 2013, consultative examiner Dr. Timo Hakkarainen opined plaintiff could lift twenty pounds occasionally and ten pounds frequently on the right, and ten pounds occasionally and frequently on the left; could reach, handle, and finger without limitation on the right and less

than an hour on the left; should not climb ladders, kneel, crouch, or crawl; and should not work around heights. (AR 315.) Plaintiff avers the ALJ erred in rejecting this opinion,[2] and in accepting the contrary opinion of consultative examiner Dr. Gary Gaffield and the observations of psychological consultative examiner Dr. Lezlie Pickett.

The ALJ did not wholly reject the shoulder-related limitations assessed by Dr. Hakkarainen. He found plaintiff able to perform light work, which involves lifting no more than ten pounds frequently, and included limitations to no overhead work with the left upper extremity, no climbing ladders, ropes, or scaffolds, and no work requiring plaintiff to hold on to grab bars, railings, or ladders (AR 26, 315.) However, the RFC allows for occasional lifting of twenty pounds on both the left and right, occasional left upper extremity pushing and pulling, and frequent reaching, handling, or fingering on the left and right. (*Id*.) The RFC is consistent with the April 2014 opinions of Dr. Gaffield (AR 379-80), and took into account Dr. Pickett's April 2014 observations of plaintiff's greater capabilities and volitional limitation (AR 385-88).

As described by the ALJ, Dr. Hakkarainen did not find evidence of arthropathy or tendinopathy in the right shoulder, but found "likely 'rotater cuff arthropathy' of the left shoulder." (AR 31 (citing AR 315).) Plaintiff appeared "'extremely apprehensive and protective of both his shoulders'" during the examination, but his "apprehension seemed decreased as the claimant helped his significant other carry objects out[.]" (*Id*. (citing AR 313).) The ALJ found this inconsistent presentation to undermine plaintiff's credibility and indicate greater functioning than presented with or alleged. He found plaintiff's protective presentation with both shoulders inconsistent with the treatment record, "wherein the claimant reported only a right shoulder ache

---

[2] Dr. Hakkarainen also found no limitation in standing, walking, sitting, climbing upstairs, balancing, stooping, or with environmental conditions other than heights. (AR 315.) Plaintiff, as discussed below, argues the ALJ erred in accepting Dr. Hakkarainen's opinion on standing and walking.

ORDER
PAGE - 5

'sometimes[.]'" (*Id.*) Dr. Hakkarainen noted decreased "'volitional' range of motion" in the right shoulder, but "full active and passive range of motion[,]" "[d]ecreased abduction, flexion, and external rotation" in the left shoulder, and "5/5 strength in all of his extremities, including grip strength. (AR 31 (citing AR 314-15).)

The ALJ assigned some weight to Dr. Hakkarainen's opinion in finding it supported by observations made and testing performed. (*Id.*) He did not give the opinion greater weight because plaintiff's reports and presentations were not entirely credible.[3]

Plaintiff does not challenge the ALJ's credibility finding. The unchallenged and specific, clear, and convincing reasons provided in support of that conclusion include inconsistencies in reporting of alcohol and drug use; inconsistencies between the degree of limitation alleged and the minimal treatment sought and needed, and with the treatment records themselves; evidence of secondary gain and showing a more active lifestyle than alleged; inconsistency between testimony and reporting to medical personnel; and observations of medical examiners and treating personnel. (AR 23-25, 27-32.)

Plaintiff does argue the ALJ erred in relying on the credibility finding to reject the opinions of Dr. Hakkarainen given that this examining physician did not himself discredit plaintiff's complaints and supported his opinions with his own observations. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate

---

[3] In Social Security Ruling (SSR) 16-3p, the Social Security Administration (SSA) rescinded SSR 96-7p, eliminated the term "credibility" from its sub-regulatory policy, clarified that "subjective symptom evaluation is not an examination of an individual's character[,]" and indicated it would more "more closely follow [its] regulatory language regarding symptom evaluation." SSR 16-3p. However, this change is effective March 28, 2016 and not applicable to the August 2014 ALJ decision in this case.

ORDER
PAGE - 6

opinion with his own observations.") Plaintiff also points to other treatment records, both before the ALJ and submitted to the Appeals Council, as bolstering Dr. Hakkarainen's opinion, and criticizes the ALJ's reliance on the opinions of other consultative examiners. (*See* Dkt. 16 at 4-7.) Plaintiff does not, however, demonstrate error in the ALJ's consideration of his shoulder impairment.

"An ALJ may reject a treating [or examining] physician's opinion if it is based 'to a large extent' on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (quoting *Morgan*, 169 F.3d at 602). This remains true even where a physician considers objective findings on examination. *See, e.g., Chaudhry v. Astrue*, 688 F.3d 661, 667 (9th Cir. 2012). An ALJ may also consider inconsistency between a physician's opinion and medical evidence of record, *Tommasetti*, 533 F.3d at 1041, and discrepancy or contradiction between a physician's opinion and that physician's own notes or observations, *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

In this case, Dr. Hakkarainen himself raised a question as to the reliability of plaintiff's presentation on examination: "When leaving the examination, he does appear to have a subjectively decreased apprehension in helping his significant other carry objects out. This may represent some volitional affect of his complaints." (AR 313.) Other physicians raised similar concerns. In April 2013, Dr. Gaffield described plaintiff's disheveled appearance, with dirty and grimy hands, and stated plaintiff "looks as though he had been doing some heavy labor." (AR 377, 379; *see also* AR 32.) In April 2014, Dr. Pickett observed plaintiff "evidenced zero restriction of movement[,]" and "moved all extremities quickly and easily throughout the full range of motion without any sign of distress, pain, or difficulty." (AR 385.) She elaborated with respect to plaintiff's shoulders:

> In fact, though he reported having 'pain' in his shoulders, on several occasions throughout the interview he would bend at the hips and lean fully forward with his right and left arms completely and fully extended in front of him, then rifle through various papers that he had spread out on the floor before him or pick up/place something on the floor. At one point, his arms were outstretched and appeared nearly hyper-extended, but he was moving them easily. When asked how he could show such range of motion when he said he was in 'severe pain,' he seemed surprised and quickly tried to recover, jumping back into an upright position in the chair, laughing and stating, 'Oh, yeah. I am not supposed to show that I can do that, right? [Laughing.]' Additionally, though he reported his back was in 'pain,' it was noted that – when he wasn't bending forward to rifle through the papers on the floor in front of him – he spent most of the interview with his forearms bent up towards his ears and his head resting in his hands, which were placed behind his head.

(AR 385-87 (also including other observations of plaintiff's physical functioning).)

The fact Dr. Pickett is a psychologist does not render her observations irrelevant. As explained by the ALJ: "[W]hile this was a psychological examination, Dr. Picket recorded careful observations related to the claimant's presentation which are of value when considering the claimant's presentation to other medical personnel." (AR 24.) The ALJ found Dr. Pickett's detailed discussions of her observations to bolster the weight her opinion was due. (AR 25.)

Nor does plaintiff persuasively rely on evidence submitted to the Appeals Council. As the Commissioner observes, that evidence does not include a medical opinion assessing functional limitations retroactive to the time period under consideration. (*See* AR 394-459). The evidence also provides additional support for the ALJ's reasoning in showing treating physician Dr. Daniel Clerc suspected "some possible symptom magnification." (AR 411; *see also* AR 439 (further advising, during this September 2014 office visit, that any MRI would be performed "for purposes of medical management" and not "for the purposes of satisfying request from lawyers [sic] office in pursuit of" a disability claim).)

The ALJ reasonably considered evidence of unreliable symptom reporting and presentation, including Dr. Hakkarainen's own observation, as a basis for not according full weight to the shoulder-related limitations assessed. The ALJ's description of this opinion further reveals consideration of inconsistency with medical evidence of record, and between the limitations assessed and the objective findings on examination. (*See* AR 31.) Plaintiff offers a different interpretation of the medical evidence, but the ALJ's interpretation is at least equally rational. The ALJ's consideration of the evidence relating to plaintiff's shoulder impairment has the support of substantial evidence and will not be disturbed.

B.  Standing and Walking Limitations

Both Dr. Hakkarainen and Dr. Gaffield opined plaintiff had no limitations in standing, walking, or sitting. (AR 315, 380.) Dr. Gaffield assessed a need to avoid walking on irregular surfaces due to plaintiff's left foot fracture, and opined: "A boot protecting plaintiff's left foot would be essential, unfortunately he chooses not to wear it. If he did it should be used on all terrains and all occasions." (AR 380.)

The ALJ gave some weight to Dr. Hakkarainen's opinion for the reasons stated above. (AR 31.) He gave significant weight to Dr. Gaffield's opinion, finding it largely consistent with observations on examination, but did not wholly adopt the opinion because Dr. Gaffield did not have the benefit of the record in its entirety. (AR 32.) The ALJ contrasted Dr. Gaffield's observation that plaintiff walked with a limp, with Dr. Pickett's observation, only five days earlier, that plaintiff was able to walk without pain behavior. The ALJ added: "Dr. Gaffield also did not have the benefit of the claimant's testimony of mowing the lawn during the relevant time period or picking up yard debris. While the claimant attempted to minimize this at the hearing, Dr. Gaffield did observe the claimant had grimy hands." (*Id.*) The ALJ did not include any limitations

in walking or standing, but did include Dr. Gaffield's assessment of a limitation to work not requiring walking on irregular surfaces. (AR 26.)

Plaintiff avers error in the ALJ's reliance on the opinions of Drs. Hakkarainen and Gaffield, pointing to medical records relating to his foot fracture. Plaintiff reported he injured his foot in late August 2013 and received a diagnosis of a fracture on September 6, 2013. (AR 350.) X-rays taken two days prior to the diagnosis "show a minimally displaced fracture at the base of the fifth metatarsal, proximal to the intermetatarsal joint." (*Id*.) On September 19, 2013, orthopedic surgeon Dr. Michael Miller noted plaintiff had broken two casts since the fracture, described a new x-ray as showing a slightly more displaced fracture, and switched plaintiff to a fracture boot given concern he could not care for a cast. (AR 349-50.) In January 2014, plaintiff reported to Dr. Clerc constant throbbing and pain and the need to elevate his foot and wear heavy boots to maintain any mobility (AR 361), and an x-ray showed nonunion of the fracture (AR 371). Evidence submitted to the Appeals Council shows plaintiff continued to report foot pain. (AR 443, 447, 450.)

Plaintiff observes that Dr. Hakkarainen conducted an examination in February 2013, prior to his foot fracture, and assessed his ability to stand and walk solely in relation to his low back pain. (*See* AR 311.) He describes Dr. Gaffield as appearing to deem his foot fracture a temporary condition, failing to review records or imaging results showing the nonunion fracture, and, like Dr. Hakkarainen, assessing his ability to stand and walk based solely in relation to low back pain. Plaintiff states a limitation to sedentary work, considered together with his age, education, and absence of past relevant work, mandates a finding of disability under the Medical Vocational Guidelines. *See* 20 C.F.R. pt. 404, subpt. P, app. 2.

As the Commissioner observes, the record does not contain a medical opinion limiting

plaintiff to sedentary work or any assessment of limitations by Dr. Clerc or Dr. Miller. Dr. Hakkarainen, moreover, properly considered plaintiff's ability to stand and walk in relation to his reported back impairment. (*See* AR 22.) Plaintiff does not identify any error in the ALJ's acceptance of the opinion there were no associated limitations.

Plaintiff likewise fails to demonstrate error in the consideration of Dr. Gaffield's opinion. Dr. Gaffield did not solely consider plaintiff's ability to stand and walk in relation to low back pain. Dr. Gaffield's April 30, 2014 examination occurred some eight months after plaintiff fractured his foot and described plaintiff's report regarding that impairment as follows: "He had a recent fracture of the left metatarsal mid bone. He was supposed to wear a boot, he does not wear it all the time, just wears it when his foot hurts." (AR 376.) Dr. Gaffield's examination findings included pain on manipulation at the fracture site; plaintiff's ability to rise from chairs without effort, get on and off the examination table without difficulty, and the absence of need to hold onto the walls or furniture; a limp when bearing weight in the left lower extremity; and the inability to hop, bend or squat, walk on heels, balls of feet, or in tandem due to pain at the fracture site. (AR 378-79.) Rather than finding the fracture temporary, Dr. Gaffield assessed specific limitations, including a boot to be worn on all terrains and all occasions, and the need to avoid walking on irregular surfaces. (AR 380.)

Other medical evidence of record does not undermine the ALJ's conclusion. The ALJ, earlier in the decision, reasonably determined plaintiff's foot fracture was not as limiting as alleged. (AR 30.) The ALJ noted plaintiff had destroyed multiple casts, appeared in a follow-up appointment in no apparent distress and with a cast "'completely broken' in the sole", wet, and with foreign materials inside, and found this evidence consistent with the performance of greater activities than plaintiff admitted. (*Id.* (citing AR 349).) Plaintiff was "instructed to 'start taking it

easy and allow this foot to heal'", given a fracture boot, and admitted he had increased his marijuana consumption to deal with the pain. (*Id*.) The ALJ noted that, after his January 2014 medical appointment, plaintiff continued to "wear a boot, but only when his foot hurts." (*Id*. (citing AR 376).) He concluded: "The claimant's ability to not wear a boot, and the medical records in which he has made only minimal follow up after being prescribed the boot, indicate that he is not as limited with his foot fracture as he alleged, compromising his credibility." (*Id*.)

The ALJ found plaintiff's ability to walk without difficulty during Dr. Pickett's evaluation and his tendency to walk with an antalgic gait during physical examinations "consistent with his presenting as more limited than he actually is for secondary gain purposes." (*Id*.) Dr. Pickett's report included observations of normal gait and posture; zero restriction of movement; quick and easy movement of all extremities throughout the full range of motion without any sign of distress, pain, or difficulty; and moving at a fast pace when rising from a seated position and then immediately walking at a fast pace without any evidence of difficulty, stiffness, or imbalance. (AR 385-87.) The ALJ found the fact plaintiff destroyed multiple casts consistent with a more active lifestyle than alleged. (AR 30.)

Finally, evidence submitted to the Appeals Council provides confirmation the fracture nonunion and ongoing pain occurred as a result of plaintiff's failure to follow medical directives. (*See, e.g.*, AR 450 ("The patient's likely not a good candidate for surgery given his difficulties following medical directives – exemplified when he was not able to stay off of the left foot when it was casted."); AR 439 ("We were not successful with treating his foot and now he has a nonunion fracture because of a lack of compliance with medical recommendations."); AR 454 ("Patient continues to smoke marijuana. He is [sic] really struggled with his addictions. Has caused significant problems for him in terms of making good decisions about his health.")) Considering

this evidence, and the medical opinions and evidence described above, the Court finds no error in the ALJ's assessment of plaintiff's ability to stand and walk.

C. <u>Mental Impairments</u>

The ALJ concluded plaintiff had no severe mental impairment. (AR 22-25.) Plaintiff argues that, in so doing, the ALJ erred in rejecting the opinion of examining psychiatrist Dr. Jesse Markman in favor of the opinion of Dr. Pickett. This contention lacks merit.

In a February 2013 psychiatric evaluation, Dr. Markman diagnosed plaintiff with social anxiety disorder, attention-deficit/hyperactivity disorder (ADHD), in partial remission, alcohol abuse in full sustained remission, pain due to a general medical condition, major depressive disorder in full remission, and obsessive compulsive personality disorder. (AR 307.) Dr. Markman assigned a Global Assessment of Functioning (GAF) score of 40 (AR 308), indicating "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school family relations, judgment, thinking or mood[.]" DSM-IV-TR 34 (4th ed. 2000).[4] Dr. Markman found it difficult to "appropriately characterize" plaintiff's symptoms based on the evaluation conducted and the information available at that time. (AR 308.) He described plaintiff's symptom reporting as "quite vague", discussed inconsistencies between possible diagnoses and plaintiff's symptom reporting, and noted plaintiff was not receiving any psychiatric treatment. (*Id.*) Dr. Markman opined plaintiff could perform simple and repetitive tasks and would likely not have more difficulty completing more detailed and complex tasks, with the exception of possible difficulty with more abstract testing and concepts. (*Id.*) Plaintiff could accept instructions

---

[4] The most recent version of the DSM does not include a GAF rating for assessment of mental disorders. DSM-V at 16-17 (5th ed. 2013). While the SSA continues to receive and consider GAF scores from "acceptable medical sources" as opinion evidence, a GAF score cannot alone be used to "raise" or "lower" someone's level of function, and, unless the reasons behind the rating and the applicable time period are clearly explained, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis. Administrative Message 13066 ("AM-13066").

ORDER
PAGE - 13

from supervisors and may have more difficulty interacting with coworkers and the public due to his significant symptoms of anxiety, but could perform work activities on a consistent basis with additional supervision. Plaintiff's "only significant limitations in this regard are those caused by his physical problems and chronic pain." (*Id*.) Plaintiff "may have some difficulty maintaining regular attendance in the workplace, as frequently he won't leave his house because of his significant symptoms of anxiety[,]" and "would not be able to complete a normal workday or workweek without interruptions from his psychiatric conditions, specifically his symptoms of anxiety." (AR 308-09.) Dr. Markman anticipated plaintiff would not deal well with the usual stress encountered in a competitive work environment due to his tendency to isolate in response to stress. (AR 309.)

The ALJ gave Dr. Markman's opinion little weight. (AR 23.) He found it inconsistent with Dr. Markman's own observations and examination, "where the claimant was able to perform well, he was calm, and he was cooperative." (*Id*. (also describing plaintiff's performance on testing as including regular speech, logical thought process, affect congruent with content, full orientation, ability to recall 5/5 digits backward and 3/3 items after a delay, and ability to follow a three-step command and spell "world" backward).) The ALJ noted Dr. Markman's own consideration of inconsistencies and the difficulty in assessing plaintiff's situation. Further, the assessment Dr. Markman provided "was based on what was available to him, but . . . the subsequent examination by Dr. Pickett provides insight into why there were inconsistencies and difficulty assessing the situation." (*Id*.) The ALJ concluded Dr. Markman placed too much reliance on plaintiff's less than credible complaints, particularly complaints of pain and limitation. He found the opinion inconsistent with the opinion of Dr. Pickett, as well as with plaintiff's reports to medical personnel and the clinical observations of treating personnel.

The ALJ described Dr. Pickett's April 25, 2014 evaluation (AR 381-88) as follows:

> The claimant reported to Dr. Pickett that it would be good for him to see someone for mental health, before his disability hearing. This is consistent with the claimant getting treatment in an attempt to demonstrate disability, but inconsistent with seeking treatment to improve his mental health. The claimant discussed plans of starting his own property maintenance business. The claimant explained that "[t]here really ain't nothing I can't do. I just don't really want to if I don't have to." Dr. Picket observed that the claimant was outgoing, cheerful, and friendly. The claimant made good eye contact and he was attentive. . . . The claimant admitted that he is "generally a really happy kind of guy." He was able to recall 3/3 items, spell "earth" backward, and repeat digits. The claimant was able to perform basic math. He followed simple and complex instructions accurately, without hesitation or difficulty. Dr. Pickett believed plaintiff's past diagnoses of mental impairments were related to his extensive drug use.

(AR 24 (internal citations omitted).) The ALJ's description also included Dr. Pickett's observations of plaintiff's physical capabilities, as contrasted with those of Dr. Gaffield only two weeks earlier. The ALJ found these inconsistent presentations to undermine plaintiff's credibility, and Dr. Pickett's observations, while made during a psychological evaluation, to be careful, detailed, and of value. (AR 24-25.)

Dr. Pickett diagnosed alcohol dependence (unknown current use status), polysubstance abuse versus dependence (unknown current use status), and cannabis dependence (self-reports current daily or near daily use). (AR 387.) As further described by the ALJ:

> Dr. Pickett explained that there was a "large discrepancy between what [the claimant] is capable of doing versus what he is willing to do. His apparent lack of motivation to obtain or maintain employment, superimposed on what appears to be a significant motivation to present himself as severely impaired." Dr. Pickett opined that the claimant had no impairments in his ability to understand, recall, or follow through on instructions, regardless of complexity. Dr. Pickett explained that the claimant's "behavior is volitional and he can change his behavior to suit his goals in the moment."

ORDER
PAGE - 15

(AR 24-25 (internal citations omitted).)

The ALJ assigned Dr. Pickett's opinion great weight. (AR 25.) He found the opinion consistent with both Dr. Pickett's and Dr. Markman's observations and testing. The ALJ also found the opinion consistent with the treatment record. The ALJ had previously described the treatment record as inconsistent with the degree of mental difficulty alleged, citing an April 2013 denial of depression or anxiety, a May 2013 impression of plaintiff as "'very well' and 'happy'," and observations he was calm and cooperative during treatment. (AR 22.)

The ALJ also described evidence associated with plaintiff's alcohol and marijuana use. In October 2013, plaintiff denied having an alcohol problem or drinking that day, while medical personnel pointed out "he had been 'quite intoxicated' in previous visits." (AR 22 (citing AR 364).) "Plaintiff attributed this to marijuana, not vodka[,]" was counseled to discontinue both marijuana and alcohol, and it was stressed that "'alcohol is a core issue [a]nd central to his health problems." (AR 22-23 (citing AR 364).) The ALJ concluded plaintiff controlled information with medical personnel, often denying alcohol use, while having a hidden flask of alcohol stuffed in his cast, and denying a history of illegal substances, but admitting its use when confronted with specific information, explaining he "'just didn't think it looked good to put that down.'" (AR 23 (citing AR 384).)[5]

---

[5] In February 2013, plaintiff reported to Dr. Markman "he generally doesn't drink now but then reports he maybe had two beers at the Super Bowl[,]" and that "drinking is just very occasional for him at this point." (AR 306.) Plaintiff stated drinking "was never really a big deal for him[,]" but then described earlier DUIs, heavy drinking, and inpatient treatment. (*Id*.) Plaintiff reported he occasionally smoked marijuana, but denied any other drug use. (*Id.*) Dr. Markman assessed alcohol abuse "in full sustained remission." (AR 307.) In April 2014, plaintiff reported to Dr. Pickett "a lengthy history of alcoholism, but said he stopped drinking 'in July of last year.'" (AR 384.) "[H]e smokes marijuana currently and 'has it at home,' but doesn't want to 'have another bad habit.'" (*Id*.) Plaintiff at first denied any history of illicit drug use/dependence, but when presented with documentation from a hospital indicating "a significant and longstanding history of meth, cocaine, crank, and IV drug use he looked chagrined and smiled, stating, 'Okay, okay. You got me. I just didn't think it looked good to put that down. But yeah. I have done all that.'" (*Id*.) Plaintiff further "acknowledged, upon detailed inquiry, that his past mental health diagnoses

ORDER
PAGE - 16

Plaintiff states Dr. Markman was aware of his own findings on examination and asserts the ALJ improperly sought to interpret those findings on his own. Plaintiff criticizes Dr. Pickett's extensive comments on his physical functioning despite a lack of training in that area and the absence of records to review. Plaintiff states at least some of his medical providers were aware of his drug use when they made mental diagnoses rejected by Dr. Pickett, and made those diagnoses when he was in prison and lacked access to alcohol or drugs. Plaintiff identifies issues with his reporting to Dr. Pickett, stating his ADHD causes him to speak and act impulsively, noting his eighth grade education, and contending his bragging and "remarkably candid" statements did "not sound like someone who is attempting to present himself as more limited than he really is." (Dkt. 16 at 9-10.) Plaintiff notes Dr. Pickett was unaware of the observations of Dr. Clerc, who had been providing treatment for some time and urged plaintiff to have a psychiatric evaluation. (*See* AR 450.) Plaintiff avers harm given that the step two finding he had no severe mental impairments implicated all subsequent steps in the sequential evaluation.

The Court finds no error. As stated above, an ALJ may reject a physician's opinion based on inconsistency, both internally and with other medical evidence, and based on significant reliance on a claimant's discredited self-reports. *Tommasetti*, 533 F.3d at 1041, and *Bayliss*, 427 F.3d at 1216. The ALJ here reasonably considered Dr. Markman's discussion of the difficulty he encountered in rendering an assessment given plaintiff's vague reporting and inconsistencies with medical records, the insight as to that difficulty provided in Dr. Pickett's subsequent evaluation, the observations of plaintiff and plaintiff's performance on testing in both examinations, and Dr. Markman's clear reliance on plaintiff's discredited symptom reporting (*see* AR 308 (explaining

---

(with the exception of childhood ADHD/ADD) occurred while he was abusing drugs and that he rarely informed treating providers of the extent of his drug use and addiction issues." (*Id.*) "He acknowledged that he 'might still dabble a bit in drug use, but 'not as much as before.'" (*Id.*)

the assessed limitations or possible limitations as due to "his significant symptoms of anxiety[,]" "his physical problems and chronic pain[,]""as frequently he won't leave his house because of his significant symptoms of anxiety, "specifically his symptoms of anxiety[,]" and "as currently stress only causes him to isolate."))

Plaintiff offers an alternative interpretation of the evidence. Because the ALJ's interpretation is at least equally rational, plaintiff's arguments do not undermine the ALJ's assessment of the medical opinions and evidence. The ALJ's consideration of plaintiff's mental impairments, the opinions of Drs. Markman and Pickett, and the medical evidence of record has the support of substantial evidence.

## Lay Testimony

Lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence and cannot be disregarded without comment. *Van Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). *But see Molina v. Astrue*, 674 F.3d 1104, 1115-22 (9th Cir. 2012) (describing how the failure to address lay testimony may be harmless). The ALJ can reject the testimony of lay witnesses only upon giving germane reasons. *Smolen v. Chater*, 80 F.3d 1273, 1288-89 (9th Cir. 1996).

The ALJ described lay witness testimony from plaintiff's wife, Traci Comstock, provided in a February 2013 form and at hearing. (AR 32-33, 74-81, 240-47.) He gave little weight to the report and testimony upon finding inconsistency with the record as a whole. (AR 33.) The ALJ contrasted testimony of plaintiff and his wife as to the number of naps taken during a day and plaintiff's ability to perform yard work, as well as Mrs. Comstock's report plaintiff needed help with his hair and Dr. Pickett's observation of plaintiff casually relaxing with his hands behind his head. The ALJ stated Mrs. Comstock "was often out of the house working and she appeared to be

unaware of many of the claimant's activities, such as his marijuana use." (*Id*.) The ALJ found her ability to observe plaintiff limited and her testimony to contradict plaintiff's reports. The ALJ found Mrs. Comstock's contention plaintiff could only walk 100 feet inconsistent with strength testing in the record, clinical observations, and x-ray imaging, inconsistency between her report and the opinions of all medical professionals that plaintiff had no limitation in sitting, and inconsistency with Dr. Gaffield's opinion plaintiff had no standing or walking limitations. (AR 33-34.) The ALJ found Mrs. Comstock's explanation of the destroyed casts not credible, "unless the claimant was performing a greater degree of yard tasks than she admitted." (AR 34.)

Plaintiff disputes or minimizes inconsistencies identified by the ALJ. She states Dr. Pickett's observation of his hands behind his head did not take into account his testimony he could raise his arm, but could not use it to, for example, push down with a deodorant stick. (AR 62-64.) Plaintiff notes in his testimony he destroyed his first cast because he had run out of gas and was forced to hobble down the freeway (AR 58-59), the testimony from both plaintiff and his wife as reflecting his ultimately unsuccessful attempt to pick up construction scraps in his yard with one arm (AR 59-61, 77), his wife's explanation for his destroyed cast as owing to hidden holes in the tall, wet grass in their yard (AR 76-77), and his wife's testimony she worked from 2:15 p.m. to 10:30 p.m. (AR 75).

Germane reasons for discounting lay testimony include inconsistency with the medical evidence, with evidence of a claimant's activities, and with a claimant's reports. *Lewis v. Apfel*, 236 F.3d 503, 511-12 (9th Cir. 2001). The ALJ here reasonably assigned little weight to Mrs. Comstock's testimony for all of these reasons.

Plaintiff offers alternative interpretations of the testimony and evidence in relation to some of the examples provided in support of the ALJ's conclusion. Plaintiff does not, however,

ORDER
PAGE - 19

demonstrate the ALJ's interpretation was not rational and, in some respects, fails to address the reasons and examples cited by the ALJ. Plaintiff does not, for example, address the inconsistency between Mrs. Comstock's testimony and medical opinions and the medical record. Also, and contrary to plaintiff's suggestion (*see* Dkt. 16 at 12), the ALJ did not state Mrs. Comstock was unaware of her husband's activities because she worked during the day. He noted Mrs. Comstock was "often out of the house working", and reasonably construed her testimony as showing she had limited ability to observe plaintiff and appeared unaware of many of his activities. (*See* AR 75 ("Yeah, he drinks a little bit, like a little bit of beer now and then. He's not a heavy drinker. He doesn't do any of that. I guess that was in young days. We married late. . . . Maybe a little a week, not that much. . . . I haven't seen [him use marijuana.] I haven't – I don't do anything like that, so I don't know."; stating she had not "known him" to use marijuana).) The ALJ, in sum, provided multiple germane reasons for assigning little weight to the lay testimony.

## **CONCLUSION**

For the reasons set forth above, this matter is AFFIRMED.

DATED this 6th day of October, 2017.

Mary Alice Theiler
United States Magistrate Judge